# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PONSFORD P. DOE                          :        CIVIL ACTION
                                         :
    vs.                                :
                                         :
APRIA HEALTHCARE, INC.                   :        NO. 13-4204

## ORDER

AND NOW, this _____ day of _____, 2014, upon

consideration of Defendant Apria Healthcare, LLC's Motion for Summary Judgment, and any

responses thereto, it is hereby ORDERED that said Motion is DENIED.

BY THE COURT:

_____
                                                           J.

Gerald Jay Pomerantz, Esquire (gjp4982)                    Attorney for Plaintiff
21 S. 12th Street
7th Floor, Stephen Girard Building
Philadelphia, PA     19107
(215) 569-8866
gjpomlaw@hotmail.com

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PONSFORD P. DOE** | : | **CIVIL ACTION** |
| | : | |
| **vs.** | : | |
| | : | |
| **APRIA HEALTHCARE, INC.** | : | **NO. 13-4204** |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.     FACTS

Plaintiff Ponsford Doe (hereinafter "Doe"), along with his wife, came to the United States in 2005 as refugees from Liberia by way of Sierra Leone (Deposition of Ponsford Doe, hereafter "Exhibit A"pg. 11-13). Doe began working for Defendant Apria Healthcare Inc. (hereafter "Apria") in order to support his family and was hired as a temporary worker at Apria's plant on Creek Road in Boothwyn Pennsylvania (Exhibit A pg. 26-27). Doe's job in Apria's transfill operation included scraping and cleaning used medical oxygen tanks so they could be refilled and reused (Exhibit A pg. 30 & 33-34).

Transfill work at Apria's Boothwyn plant was strictly regulated pursuant to both FDA and Apria policy, but the rules were enforced differently depending on race; Doe explained "the blacks have [their] own rules and the white has their own rules and our rules were stricter"

(Exhibit A pg. 113). Doe's testimony regarding Apria's racist application of workplace rules is confirmed by Affidavit of former Apria employee Diego Singleton, "What I saw was that there was distinction between those who would get hassled and those who didn't get hassled, and what I saw as the difference was the color barrier" (Affidavit of Diego Singleton. hereafter "Exhibit B"). Apria transfill employees were discouraged from going to the bathroom when not on break and were required to provide notice if leaving the floor to use the bathroom (Exhibit B). This rule was not strictly enforced for white employees but when Doe would use the bathroom his supervisor William Crocker (hereafter "Crocker") would call him on the plant's intercom or go and personally direct  him out of the bathroom stall (Exhibit A pg.89 & 111 & 243 & Exhibit B) Generally cell phones were only to be used during emergencies, Crocker did not allow black employees to take personal phone calls while working, but white employees were allowed to use their phones without sanction (Exhibit A pg. 121) Apria's transfill workers would sometimes listen to music while working and take turns making music selections (Exhibit A pg. 145-147). Only when it was the black workers turn to select the radio station was the radio routinely confiscated and turned off by Crocker (Exhibit A pg. 145-147).  Crocker would ignore talking on the job between white employees but did not tolerate conversation between black employees (Exhibit A pg. 238 & Exhibit B). Crocker also required black employees to be changed before clocking in and after clocking out but turned a blind eye to white employees disobeying the same rule (Exhibit A pg. 125 & Exhibit B). Doe didn't complain about Apria's racist workplace as a temporary worker because he was afraid of losing his job (Exhibit A pg. 110).

Due to his strong work ethic, Doe was hired as a full time employee by Apria in June of 2010 (Exhibit A pg. 35). Doe began to complain of unequal treatment based on race when he was hired as a full employee (Exhibit A pg. 110). Several times a month Doe would ask to see

2

Crocker in his office to talk about the unfair and racist application of workplace rules (Exhibit A pg. 98 & 107-108). Another former Apria employee, Joseph Vitellaro (hereafter "Vitellaro"), confirmed that Doe would often go to Crocker's office to complain (Deposition of Joseph Vitellaro, hereafter "Exhibit D", pg. 178). Crocker admits that Doe made at least one complaint to him regarding his racist application of the rules (Deposition of William Crocker, hereafter "Exhibit E" pg. 121) During these meetings Doe would not only complain of unequal treatment but would also try to persuade Crocker to change his ways by discussing Martin Luther King Jr., the civil rights movement, and specifically the white people who had marched beside Dr. King (Exhibit A pg. 235-236). Crocker's response to Doe's complaints was "if you don't like the way we operate things here, you can find another job or you can quit" (Exhibit A pg. 109).  Doe also told Apria's building operation manager, Ron Smith (hereafter, "Smith"), about the racist enforcement of the rules (Exhibit A pg. 116 & 120-125).  Smith responded by telling Doe that he talked too aggressively (Exhibit A pg. 127).

In November of 2011 a white temporary employee, Dave Rudeman, walked over to Ponsford Doe and ordered, "monkey hurry up" (Exhibit A pg. 225). Doe ignored him and continued to work, but Rudeman continued, "I'm talking to you monkey, hurry up." (Exhibit A pg. 225).  Doe reported the incident to another Apria employee who reported it to Crocker (Exhibit A pg. 226-229). Rudeman was not punished, but continued with Apria until work slowed down. However, Rudeman was later rehired by Crocker as a full time when work picked up again (Exhibit A pg. 229 & Exhibit F pg 130-132). Crocker admits that he knew Rudeman called Doe a monkey, that Crocker created no record of it, but argues that he fired Rudeman. However, Crocker also admits that he rehired the former temporary worker two months later as a full time employee (Exhibit E pg. 117-118).

3

Doe persevered, and as a full time employee aspired to more stimulating work, seeking out opportunities to learn the different functions of the transfill operation including tank filling and post filling (Exhibit A pg. 50 & 85). Nonetheless, Crocker's evaluation of Doe, dated July of 2011, noted that Doe needed to show more motivation for learning the fill room and post fill area responsibilities (Exhibit C pg. 90). In fact, Doe had asked Crocker to learn those parts of the transfill process (Exhibit A pg. 93). In response to Doe's requests, Crocker had promised to train Doe, but never followed through (Exhibit A pg. 93). During this time, Defendant's plant employed African Americans as tank cleaners but none were employed in the higher level fill room job (Exhibit A pg. 86-87). Doe complained about the lack of equal opportunities based on race in an Apria electronic survey, and shortly thereafter was trained for the fill room and post fill area (Exhibit A pg. 88-89 & 91-92 & 100). When Doe worked as a tank filler, Crocker continued his racist enforcement of the rules and would often criticize minutia in Doe's work including such details as the way he wrote the number eight (Exhibit A pg. 55-56 & pg. 60 & 66). Another QCU at Apria testified that Doe picked up the fill room job quickly and, "one thing I remember, he had good handwriting when he first started" (Deposition of Brent Ennis, hereafter "Exhibit L" pg. 88-89). Doe continued to make complaints regarding racist application of workplace rules.

In filling medical oxygen tanks, Apria employed both a filler, such as Doe, and a member of the quality control unit (hereafter, "QCU"). The QCU had greater responsibility and more training than the filler (Exhibit A pg. 142). Crocker testified that the QCU was responsible for helping the filler and that the QCU and filler would work together on many parts of the fill and post fill job (Exhibit E pg. 142-144). Vitellaro, a white employee of Apria, was a QCU who often worked alongside Doe in the fill room. When working together, Vitellaro and Doe would

4

"work hand and hand" such that "[Vitellaro] might be doing my work. I might be doing his work." (Exhibit A pg. 176).

As the filler, Doe both filled oxygen tanks and filled out the accompanying paperwork (Exhibit A pg. 175-177). Each medical oxygen tank was stamped with a sticker which allowed it to be identified, and if necessary, recalled to prevent harm to patients. The stickers were applied with a gun by the filler or by a member of the QCU who worked alongside the filler (Exhibit D pg. 162-164). Vitellaro testified that as QCU he commonly helped fillers with stamping the tanks with the lot tag sticker (Exhibit D pg. 164). The QCU, as the name implies, had responsibility for making sure that all documents for keeping track of the tanks were correct: Keith Simpkiss (hereafter, "Simpkiss"), one of Apria's QCU's testified, "The QCU was supposed to go and check every run. Approximately about every three runs the QCU goes, and goes through every run double checking them." (Deposition of Keith Simpkiss, hereafter "Exhibit G", pg. 35).

The QCU and filler worked with a two sided document to keep track of the medical oxygen tanks, on the first side, (1) the lot sample page[1] and on the second side (2) the filling record[2]. The lot sample page contains a copy of the sticker used on each tank's grouping or lot. Each box on the lot sample page is numbered which corresponds to an individual lot, a grouping of tanks. The filler had responsibility for entering the stamps on this page and the QCU has responsibility for ensuring their correctness (Exhibit G pg. 120).

The filling record provides further detail concerning the tank filling process. The filling record could not be completed by the filler alone, and was not valid until each individual line was reviewed and signed by the QCU (Exhibit E pg. 191). The numbered rows on the filling

---

[1] An example of a lot sample page can be seen in Exhibit K pg. 824
[2] An example of a filling record can be seen in Exhibit K pg. 358

record correspond to the lots in the numbered boxes in the lot sample page. For the QCU to
adequately review the filling record before signing, it was necessary to check each row of the
filling record against the corresponding box of the lot sample page (Exhibit E pg. 295 & Exhibit
G pg. 40-47).

On August 29 2012, Doe arrived for his shift around 2:00 P.M and began work with
Vitellaro as his QCU. (Exhibit A pg. 167). As part of the job, Vitellaro verified and signed each
row of the filling record, which would have necessitated checking the lot information in the
filling record against the corresponding information in the lot sample page (Exhibit E pg.
295).When the shift was finished, Doe left the plant and began a holiday weekend with his
family.

At approximately 6 A.M. on August 30th 2012, as part of his regular routine, Ron Smith,
Plant Manager but not a QCU, picked up the transfill logs from Crocker's office and reviewed
the paperwork of the previous day (Deposition of Ron Smith, hereafter "Exhibit F" pg. 33-35).
Smith found that the lot sample page had inconsistent dating (Exhibit F pg. 44). Smith wrote
down his findings on a note and took the paperwork unchanged to Crocker's office (Exhibit F pg.
44-45 & 49). Back at Crocker's office, Smith found Simpkiss and told him of his findings. Smith
instructed Simpkiss to find and quarantine the product and to "to make sure that they found out
what the issue was" (Exhibit F pg. 51 & 165). Simpkiss quarantined the tanks, checked and
changed the tank's lot tags, and says that he found one of the lot guns set to the incorrect date
(Exhibit F pg 115-118 & Exhibit G pg. 61 & 82-83). Simpkiss claims to have found the main
gun set to the correct date but the "spare off to the side" was set incorrectly (Exhibit G pg. 82-
84).  Simpkiss claims to have scraped off the incorrect lot tags and then stamped the tanks with
correct tags (Exhibit G pg. 87). The incorrect lot sample page was corrected but Simpkiss

6

doesn't remember who did it (Exhibit G pg. 100). Simpkiss admits that no one specifically witnessed him make these corrections, although Crocker claims to have observed (Exhibit G pg. 111 & Exhibit E pg. 213).  Apria policy requires that any errors which are caught are crossed off and initialed (Exhibit E pg. 73). Neither the tanks nor the batch sample page were marked in any way to show that an error had been caught and that the records had been changed (Compare: Exhibit K pg. 59 vs. pg. 825).

Of the lots which were filled and stamped on Doe and Viterllaro's shift 10 out of 22 allegedly bore an incorrect date (Exhibit A pg. 182). The lots which were alleged to have been marked incorrectly are not consecutive; this would require changing the date setting of the gun back and forth between lots or using a different gun for each lot. Even within individual lots which were alleged to have been marked incorrectly, some tanks were dated correctly (Exhibit G pg. 70 & 78).  In turn, this would have required changing the date setting of the gun back and forth or using a different gun for each individual tank within the same lot. As was common practice, Doe would have only used one labeling gun (Exhibit A pg. 175).

Both FDA regulations and Apria policy require an investigation, a "root cause analysis", into errors regarding medical gas tanks which slip by the QCU. Apria's definition of a Medical Oxygen Complaint specifically includes a "written or verbal complaint", "from an employee working at one of our branches", regarding "a product that was mislabeled" (Apria Policy Video Transcript, hereafter "Exhibit H"). Per Apria policy, once a complaint is received it is required to 1) advise the branch manager; 2) the branch manager must gather information; 3) the equipment must be quarantined; 4) an Apria occurrence report must be filled out and faxed to the legal department; 5) the office of corporate quality control unit must be contacted; 6) the corporate quality control unit will then provide direction for the investigation 7) all original documents and

employee statements must be forwarded to the legal department (Exhibit H). Additionally, a

copy of the report generated from such an investigation must be kept at the branch in an

"Oxygen Complaint File" in order to comply with FDA regulations (Exhibit H). Regarding the

particular details of this case, FDA official Vlada Matusovksky explained:

> 21 CFR 211.192 requires that 'Any unexplained discrepancy…shall be thoroughly
> investigated, whether or not the batch has already been distributed…A written record of
> the investigation shall be made and shall include the conclusions and follow-up.' In the
> case you described, the firm would be expected to conduct (and document) an
> investigation to determine the root cause(s) of the incident and corrective and
> preventative actions.
> (Opinion of Matusovsky, hereafter "Exhibit I").

Early on, Smith[3] told Crocker that further investigation was necessary (Exhibit E pg.

211). Crocker has admitted that a mistake of the nature alleged, if not caught, increased the risk

of illness or death for patients using Apria oxygen tanks (Exhibit E pg. 174-175). However, no

formal investigation was ever conducted (Exhibit E pg. 244-245). Crocker claims[4] to have

spoken to Vitellaro, who he says offered no explanation (Exhibit E pg. 272). It is undisputed that

no one at Apria attempted to contact Doe to determine how the alleged error may have occurred.

To date, Simpkiss, an Apria QCU, admits that the nature of the error doesn't make sense, the

error has never been explained to him, and he doesn't know how it occurred (Exhibit G pg. 79-

80 & 97). Crocker has admitted "it was never determined how the wrong tag was put on there"

(Exhibit E pg. 232).

Crocker's next step was to contact the Apria corporate human resources office to seek the

termination of Doe. Crocker spoke to Apria Senior Human Resources representative John

---

[3] Smith did create an informal note to let Crocker know about the alleged error which he described as "tidbits", "like you would do if you're going to go grocery shopping, don't forget to go get milk. Don't forget to do this" explaining that "This is not a -- an FDA document. This is not an Apria document" (Exhibit F pg. 143 & 145).
[4] Crocker admits that he made of no documentation of his alleged meeting with Vitellaro (Exhibit E pg. 238).

Coleman (Deposition John Coleman, hereafter "Exhibit J" pg. 20-21). Coleman deferred to Crocker's judgment regarding the seriousness of the alleged violation and agreed to the termination of Doe (Exhibit J pg. 33-34) However on that phone call Crocker "only talked about Ponsford's error" and did not inform Coleman of Vitellaro's involvement in the alleged error (Exhibit J pg. 22). Crocker has admitted at deposition that Vitellaro made a "serious mistake" which, if not caught, could result in a failed recall leading to patient illness or death (Exhibit E pg. 172-174). Coleman was not informed by Crocker that there was a white comparator and has testified, "Well, I mean, if a white employee mislabeled over six hundred oxygen cylinders and we did not terminate him and yet requested that for a black employee, I mean, that would certainly merit looking into, yes." and "If I came upon a situation like that and I knew that in the past we had had a white employee who committed that type of error and we had not terminated and yet the supervisor was requesting it for this particular employee, I probably would have held up the termination." (Exhibit J pg. 59).

Doe returned from vacation on September 4th 2012 and was told by Keith Simpkiss that Crocker wanted to see him (Exhibit A pg. 186). Doe was called in and told he had made a mistake but was not shown the paper work substantiating the alleged error (Exhibit A pg. 180). Crocker told Doe that the mistake was serious and that according to Apria policy he had to be terminated (Exhibit A pg. 187). Doe asked to see the mistake but was refused (Exhibit A pg. 188). Doe became angry at Crocker's refusal to show him his alleged mistakes and accused both Smith and Crocker of racism (Exhibit A pg. 190). Crocker threatened to call the police when Doe got upset (Exhibit A pg. 203). Smith has explained that Crocker got Doe to sign the corrective plan by saying "look, it doesn't mean you. It just means that you were given this." (Exhibit F pg. 90). Following his termination, Doe answered an Apria corporate questionnaire to let them

9

know of ongoing racist enforcement of rules. According to Coleman, Doe notified Apria corporate of "a business practice policy or action which he believed violated law or regulation. And he wrote on the paper there's a lot of discrimination going on in Apria Healthcare, Boothwyn, PA. I said that because when a white person is given special privilege, a black person is treated with hatred and sarcasm." (Exhibit J pg. 27-28).

The next day, only after Doe's termination had been secured, Crocker gave Vitellaro a "final written warning" and Vitellaro was allowed to keep his job without further sanction . (Exhibit K pg. 816).

## II.     **STANDARD OF LAW**

a.     Summary Judgment

Pursuant to Fed. R. Civ. P 56(c), summary judgment is limited to when there are no genuine issues of material fact in dispute. When considering a motion for summary judgment, the trial court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material.  Anderson v. Liberty Lobby, 477 U.S. 242(1986).  The Anderson Court stated that a fact is material if it might affect the outcome of the suit under the applicable law, and such fact is genuine if a reasonable jury could find for the non-moving party. Ibid.at 248.

The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177, 180 (3d Cir. 1999), Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

b.    § 1981

The Third Circuit has explained that both the Price Waterhouse[5] "test introduced by Price

Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and the burden-

shifting framework introduced by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct.

1817, 36 L.Ed.2d 668 (1973), may be used to determine whether an employer has discriminated

against a plaintiff in violation of § 1981." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261

(3rd Cir. 2010)

The Price Waterhouse test requires that "if the defendant initiated an allegedly adverse

employment action as the result of both permissible and impermissible motives, the burden of

persuasion shifts to the defendant to demonstrate that it would have taken the adverse action

notwithstanding the improper motive. 490 U.S. at 244-45, 109 S.Ct. 1775; Watson v. Se. Pa.

Trans. Auth., 207 F.3d 207, 215 (3d Cir.2000)." *Smith v. City of Allentown,* 589 F.3d 684 (3rd

Cir. 2009)

The Price Waterhouse test requires a heightened showing of evidence by the Plaintiff.

*Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261 (3rd Cir. 2010). Evidence for the Price

Waterhouse test must satisfy two requirements: (1) "the evidence must be strong enough 'to

permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating

factor in the [defendant's] decision.'" and (2) " the evidence must be connected to the decision

being challenged by the plaintiff." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261 (3rd Cir.

---

[5] Plaintiff uses the designation "Price Waterhouse test" for simplicity. The Third Circuit originally referred to the
Price Waterhouse test as the "mixed motives" test but recognized that this designation was "misleading" and later
referred to it as the "direct evidence test" *Fakete v. Aetna, Inc.*, 308 F.3d 335 (3rd Cir. 2002). However, the Court
has lamented that the newer title is also "imprecise". *Id.*  The "direct evidence test is a "misnomer" because "certain
circumstantial evidence is sufficient for a mixed motives instruction, if that evidence can 'fairly be said to directly
reflect' the alleged unlawful basis' for the adverse employment decision." *Walden v. Georgia-Pacific Corp.*, 126
F.3d 506 (3rd Cir. 1997) See also: *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84, 71
USLW 4434 (2003).

2010) (citations omitted). When, "the plaintiff shows 'by direct evidence that an illegitimate criterion was a substantial factor in the [employment] decision,' the burden shifts to the defendant 'to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor.'" *Brown v. J. Kaz, Inc.*, 581 F.3d 175 (3rd Cir. 2009) If the Plaintiff presents sufficient evidence to survive summary judgment on the Price Waterhouse test, the court, "need not consider whether that claim may proceed under a McDonnell Douglas theory". *Fakete v. Aetna, Inc.*, 308 F.3d 335 (3rd Cir. 2002)

If the court finds that the Plaintiff cannot meet the evidentiary requirements for the Price Waterhouse test, it must then apply the McDonnell Douglas test which requires 1) a prima facie showing by the plaintiff; 2) a legitimate nondiscriminatory reason by Defendant; and 3) Plaintiff's showing of pretext.

## III.    ARGUMENT

### A.    Hostile Work Environment

Plaintiff is not asserting a claim for a hostile work environment.

### B.    Wrongful Termination

The elements of wrongful termination are (1) Plaintiff was a member of a protected class, (2) Plaintiff was discharged, (3) Plaintiff was qualified for the job, and (4) under circumstances that support an inference of discrimination. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1, 70 USLW 4152 (2002) Defendant does not challenge that Plaintiff, as an African American, is a member of a protected class, that he was qualified for his job as a filler at Apria's Boothwyn plant, or that he suffered an adverse employment action in the form of his employment termination.

Defendant challenges the last element of the cause of action but misconstrues its scope. Defendant's entire argument on this point relates to Vitellaro contested status as a "similarly situated" employee. Defendant's narrow argument on this point is not the law. See: "Although showing that similarly situated coworkers were treated more favorably than the plaintiff is one method of satisfying the final element of a prima facie case of discrimination, it is not the only one. The Third Circuit has stated that to establish a prima facie case, it is sufficient for a plaintiff to adduce evidence that 'establishes a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a juror could infer, in light of common experience, that the defendant acted with discriminatory intent.' *Burlington v. News Corp.*, 759 F.Supp.2d 580 (E.D.Pa. 2010) (citing: *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 275 (3d Cir.2010))

In the instant case, Doe was subject to a work environment where white employees could casually violate work rules but where such action by black employees was not tolerated. Doe regularly complained of the unfair and racist application of workplace rules to Crocker who advised him to "if you don't like the way we operate things here, you can find another job or you can quit" (Exhibit A pg. 109). The alleged error, which Defendant claims caused Doe's termination, remains completely unexplained. (Exhibit G pg. 79-80 & 97). Even Crocker has admitted "it was never determined how the wrong tag was put on there" (Exhibit E pg. 232). Despite both Apria and FDA regulations no investigation was ever formally conducted or documented. (Exhibit E pg. 244-245). Indeed, it is undisputed that no one even asked Doe, the alleged perpetrator, how the alleged mistakes were made. The evidence also shows that Crocker didn't initially report Vitelarro's involvement in the alleged accident to Apria's human resources department so as to secure the termination of Doe. (Exhibit J pg. 22). The Defendant's human

13

resources representative even testified that had Crocker not misled the human resources representative, Doe would not have been terminated (Exhibit J pg. 59).

Defendant's motion does not challenge any of the foregoing but merely argues that Vitellaro is not a comparator because a reasonable jury could not find that Vitellaro and Doe were "similarly situated" employees. *Philpot v. Amtrak*, Civil Action 10-1276. To support this contention the Defendant cites two non-precedential Third Circuit Opinions. *McCullers v. Napolitano*, 10-1461 & *Wilcher v. Postmaster General*, U.S. Postal Service, 10-3075. The only other legal authority cited by Defendant in support of their argument also relies on the previously cited non-precedential opinion of the Third Circuit. *Philpot v. Amtrak*, Civil Action 10-1276 (citing: *Wilcher v. Postmaster General*). Vitellaro testified that as QCU he commonly helped fillers with stamping the tanks with the lot tag sticker (Exhibit D pg. 164). The QCU, as the name implies, had responsibility for making sure that all documents for keeping track of the tanks were correct: Simpkiss one of Apria's QCU's testified, "The QCU was supposed to go and check every run. Approximately about every three runs the QCU goes, and goes through every run double checking them." (Deposition of Keith Simpkiss, hereafter "Exhibit G", pg. 35). When working together, Vitellaro and Doe would "work hand and hand" such that "[Vitellaro] might be doing my work. I might be doing his work." (Exhibit A pg. 176). Vitellaro was the only QCU working on Doe's shift and had exclusive responsibility for signing off the final verification that all tanks had been correctly marked and approved (Exhibit G pg. 35).

Based on the foregoing, a reasonable jury could find for Plaintiff for all elements of wrongful termination and specially "could infer, in light of common experience, that the defendant acted with discriminatory intent.'" *Burlington v. News Corp.*, 759 F.Supp.2d 580 (E.D.Pa. 2010) (citing: *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 275 (3d Cir.2010))

## C.   **Retaliation**

The elements of retaliation are 1) Plaintiff engaged in protected activity, 2) that the employer took adverse action against Plaintiff, and 3) that a causal link exists between the protected activity and the employer's adverse action. *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173 (3rd Cir. 1997) Defendant's motion does not contest Plaintiff's participation in a protected activity by making complaints regarding racial discrimination or that Apria took an adverse action against Plaintiff by firing him.

Defendant's motion challenges only the causal link between Plaintiff's complaints of racial discrimination and his subsequent termination. In making this determination the court examines "a broad array of evidence" LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217 (3rd Cir. 2007) (quoting: *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 284 (3d Cir. 2000). If temporal proximity is not a factor, the Court must then ask whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." The kinds of evidence the Court should consider include intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, the employer's treatment of other employees, or any other evidence in the record sufficient to support the inference of retaliatory animus. *Id. & Marra v. Philadelphia Housing Authority*, 497 F.3d 286 (3rd Cir. 2007).

As previously argued, Doe was subject to a work environment where enforcement of the rules differed depending on the color an employee's skin.  Crocker's regular response to Doe's monthly complaints of racial discrimination was "if you don't like the way we operate things here, you can find another job or you can quit" (Exhibit A pg. 109). .

15

Defendant's explanation for the termination is entirely inconsistent: the alleged error remains completely unexplained and despite Apria and FDA regulations no investigation was ever formally conducted or documented (Exhibit G pg. 79-80 & 97 & Exhibit E pg. 244-245). Indeed, it is undisputed that no one even asked Doe, the alleged perpetrator, how the alleged mistakes were made. The Defendant's treatment of other employees also raises an inference of causation: the evidence shows that Crocker didn't initially report Vitelarro's involvement in the alleged accident to Apria's human resources department so as to secure the termination of Doe. (Exhibit J pg. 22). The Defendant's human resources representative even testified that had Crocker not misled the human resources representative, Doe would not have been terminated (Exhibit J pg. 59).

Based on the foregoing a reasonable jury could find all elements of retaliation and specifically that Defendant's termination of Plaintiff was caused by Plaintiff's complaints of ongoing discrimination.

D.   **Pretext**[6]

"It is by now axiomatic that a plaintiff in an employment retaliation case may avoid summary judgment by offering evidence that discredits the reasons articulated by the defense for the adverse employment action." *Montone v. City of Jersey City*, 709 F.3d 181 (3rd Cir. 2013) Plaintiff may show pretext through direct or circumstantial evidence which would permit a reasonable jury to (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes v. Perskie*, 32 F.3d 759 (3rd Cir. 1994) To show either of these

---

[6] Plaintiff believes the instant case presents a strong evidentiary basis for the application of the Price Waterhouse test. Nonetheless, Plaintiff shall address the issue of pretext as argued in the alternative.

factors the Plaintiff may show the Defendant "has previously discriminated against the plaintiff, that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Russ-Tobias v. Pennsylvaia Bd. of Probation & Parole*, Civil Action No. 04-0270 (quoting: *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999))

Although it is undisputed that some oxygen tanks were marked incorrectly, Plaintiff's involvement in the alleged mistake is contested. The lots which were alleged to have been marked incorrectly are not consecutive; this would require changing the date setting of the gun back and forth between lots or using a different gun for each lot. Even within individual lots which were alleged to have been marked incorrectly, some tanks were dated correctly (Exhibit G pg. 70 & 78).  In turn, this would have required changing the date setting of the gun back and forth or using a different gun for each individual tank within the same lot. As was common practice, Doe would have only used one labeling gun (Exhibit A pg. 175).  Moreover the mistake would have required both Doe and Vitellaro to miss the glaring inconsistency thousands of times. The alleged mistake is simply improbable.

Apria policy requires that any errors which are caught are crossed off and initialed (Exhibit E pg. 73). Neither the tanks nor the batch sample page were marked in any way to show that an error had been caught and that the records had been changed (Compare: Exhibit K pg. 59 vs. pg. 825).  To date, Apria cannot identify individual who corrected the lot sample page (Exhibit G pg. 100). Despite Apria policy and FDA regulations requiring a documented investigation into mistakes of the kind alleged, no investigation ever took place (Exhibit H & Exhibit I & Exhibit E pg. 244-245). Crocker never even asked Doe how the accident occurred before rushing to place the blame on him and seeking to have him terminated.

When contacting Apria's HR department Crocker conveniently left out the fact that there was a white comparator who had a significant role in the alleged mistake (Exhibit J pg. 22). Crocker has acknowledged that Vitellaro made a "serious mistake" which, if not caught, could result in a failed recall leading to patient illness or death, yet nonetheless misled Coleman who testified,  "Well, I mean, if a white employee mislabeled over six hundred oxygen cylinders and we did not terminate him and yet requested that for a black employee, I mean, that would certainly merit looking into, yes." and "If I came upon a situation like that and I knew that in the past we had had a white employee who committed that type of error and we had not terminated and yet the supervisor was requesting it for this particular employee, I probably would have held up the termination." ((Exhibit E pg. 172-174 Exhibit J pg. 59).

Based on the foregoing a reasonable jury could disbelieve that the alleged mistake was the true basis for Doe's termination and believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes v. Perskie*, 32 F.3d 759 (3rd Cir. 1994)

IV.     **CONCLUSION**

Based on the foregoing, Plaintiff asks this Honorable Court to deny Defendant's motion on the basis of the Price Waterhouse Test or in the alternative McDonnell Douglas Test.

GERALD JAY POMERANTZ, ESQUIRE
Attorney for Plaintiff, Ponsford Doe

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PONSFORD P. DOE | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | |
| APRIA HEALTHCARE, INC. | : | NO. 13-4204 |

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 15, 2014, I served a true and correct copy of the

foregoing Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary

Judgment upon the following counsel of record via electronic filing.   These documents have been

electronically filed and are available for viewing and download from the ECF system:

> Jeffrey L. Pettit, Esquire
> Monica T. Holland, Esquire
> McElroy, Deutsch, Mulvaney & Carpenter, LLP
> 1617 JFK Boulevard
> Suite 1500
> Philadelphia, PA   19103-1815

GERALD JAY POMERANTZ, ESQUIRE

DATED: 9/15/2014